UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| BUSCH PROPERTIES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:12CV2318 SNLJ |
| | ) |
| NATIONAL UNION FIRE INSURANCE | ) |
| COMPANY OF PITTSBURGH, PA., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court on plaintiff's motion for partial summary judgment
and defendant's motion for summary judgment. The motions have been fully briefed and
are ripe for disposition. For the following reasons, the Court will grant defendant's
motion and deny plaintiff's motion as moot.

## I.    Background

This case involves a dispute over coverage for Busch Properties, Inc. (BPI) under
commercial general liability policies that National Union Fire Insurance Company of
Pittsburgh, Pa. (National Union) issued. BPI was the property manager for
condominiums at the Kingsmill Resort (Kingsmill) in Williamsburg, Virginia, a gated
residential golf community. National Union was the general liability insurance carrier for
BPI from September 1, 1994 to July 1, 2004. In 2003, BPI personnel became aware of a
serious mold problem inside the condominium development at Kingsmill.

According to BPI, the primary cause of the mold was determined to be the use of impermeable vinyl wallpaper which prevented moisture in the walls from escaping, thereby providing a fertile climate for mold to develop and spread inside the walls of the units. BPI, as the property manager, had selected and installed the vinyl wallpaper in the units at Kingsmill. As a result, BPI believed that it faced significant exposure from potential claims by unit owners and resort guests alleging property damage or bodily injury.

On December 1, 2003, BPI notified its insurers, including National Union, of the problem. BPI informed its insurers, including National Union, that its proposed strategy was to proactively remediate the problem. BPI alleges it paid remediation costs of approximately $11.3 million to address the damage caused by the mold problem. BPI claims the policies cover costs it was obligated to pay to remediate mold in the condominiums at Kingsmill. National Union has not reimbursed BPI for any portion of the remediation costs.

BPI filed this lawsuit on December 17, 2012 alleging claims of breach of contract and vexatious refusal to pay. National Union admits that BPI provided notice regarding the alleged mold problem and its efforts to remediate the affected units. National Union contends, however, that it did not consent or otherwise agree to BPI's remediation plan. National Union filed a counterclaim for declaratory relief alleging that coverage for the remediation costs that BPI seeks to recover is limited or unavailable under the terms of the 1994 and 2003 policies. BPI and National Union have each filed summary judgment motions seeking declarations as to coverage under the policies at issue.

2

## II. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden is on the moving party. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op. Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Instead, the nonmoving party bears the burden of setting forth affirmative evidence and specific facts by affidavit and other evidence showing that there is a genuine dispute of a material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex*, 477 U.S. at 324. "A dispute about a material fact is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Herring v. Canada Life Assur. Co.,* 207 F.3d 1026, 1030 (8th Cir. 2000) (quoting *Anderson,* 477 U.S. at 248). "[T]he mere existence of some alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson,* 477 U.S. at 247–48. A party resisting summary judgment has the burden to designate the specific facts that create a triable controversy. *See Crossley v. Georgia–Pacific Corp.,* 355 F.3d 1112, 1114 (8th Cir. 2004). "Because 'the interpretation and construction of insurance policies is a matter of law, . . . such cases are particularly amenable to summary judgment.'" *Bituminous Cas.*

3

*Corp. v. Scottsdale Ins. Co.,* 1:12CV84 SNLJ, 2013 WL 5739034, at *2 (E.D. Mo. Oct. 22, 2013) (quoting *John Deere Ins. Co. v. Shamrock Indus., Inc.*, 929 F.2d 413, 417 (8th Cir. 1991).

## III. Interpretation of Insurance Contracts

As the parties agree, Missouri law governs the interpretation of the insurance policies in this diversity case. *Id.* (quoting *St. Paul Fire & Marine Ins. Co. v. Missouri United Sch. Ins. Council,* 98 F.3d 343, 345 (8th Cir. 1996)). Under Missouri law, "the interpretation of an insurance contract is generally a question of law, particularly in reference to the question of coverage." *D.R. Sherry Const., Ltd. v. American Family Mut. Ins. Co.*, 316 S.W.3d 899, 902 (2010). Unless an ambiguity exists, the policy must be enforced as written. *Am. States Ins. Co. v. Mathis,* 974 S.W.2d 647, 649 (Mo.App. E.D. 1998). "Under Missouri law the plaintiff has the burden of showing that the loss and damages are covered by the policy; the defendant insurer has the burden of demonstrating the applicability of any exclusions on which it relies." *Mathis,* 974 S.W.2d at 649.

## IV. Defendant's Motion for Summary Judgment

### A. Facts

The Court has reviewed the statements, the responses, and the supporting documentation, and, where appropriate, will accept facts as supported by appropriate admissible evidence. In accordance with Local Rule 4.01 (E), all matters set forth in the movants' statement of facts are deemed admitted unless specifically controverted by the opposing party. The following facts are undisputed.

4

The Kingsmill condominiums were built near Williamsburg, Virginia between 1982 and 1992. In 2003, Kingsmill included 192 units.[1] BPI administered a rental program and acted as property manager for non-resident owners of some of the Kingsmill units. Non-resident owners participating in the rental program retained BPI as their rental agent under a rental agreement.

As rental agent, BPI required owners participating in the rental program to have vinyl wallpaper in their units. At the time BPI recommended the use of vinyl wallpaper, it was very common in the resort industry. The hotel and hospitality industry did not appreciate any risks of using impermeable finishes, such as vinyl wallpaper, until the early 2000s.

During the summer of 2003, BPI employees discovered mold in certain units at Kingsmill.[2] In October of 2003, BPI discovered crumbling drywall and a wall full of mold after a mirror fell off of a wall. BPI's expert believes that the mold at issue began causing property damage in December of 2002 and continued causing damage until remediated. However, he does not know at what rate the mold grew within and among the buildings or which buildings were damaged first.

On October 17, 2003, Kingsmill notified certain owners that "[r]ecently, in the course of our on-going renovation of the units at Kingsmill, a significant amount of mold, mildew and moisture damage was discovered. This led to a resort-wide inspection,

_____

[1] The pleadings and exhibits in this matter reference 192 units and 196 units. This discrepancy is immaterial.

[2] There is a dispute as to exactly when the mold was discovered but the exact date is immaterial for the Court's decision.

5

which revealed the presence of such conditions in many Kingsmill units." On October 24, 2003, Kingsmill sent a letter to owners that attributed the mold to excessive rainfall and a recent hurricane with an accompanying power outage. The letter discussed remediation plans, stating that all rental rooms would remain closed until remediated, that rooms would be emptied, "affected drywall" would be removed, and HVAC units would be inspected and cleaned if necessary. The letter also discussed Kingsmill's plans to renovate all rental units.

BPI required all owners to execute a Consent and Authorization ("Consent")[3] prior to BPI remediating the mold. The Consent provided that the abatement of mold would be done at no cost to the owners. Further, the Consent provided, among other things, that it did not obligate BPI to proceed with the remediation project, that BPI did not admit liability, and that the owners gave irrevocable and blanket consent to BPI to take whatever actions it deemed necessary to remediate the mold. The Consent did not provide for a general release of claims the owners might have against BPI. BPI began requesting that owners execute the Consent by October 31, 2003.

BPI did not receive any claims from property owners, nor were any lawsuits filed against it, related to the mold issue. BPI did not enter into any settlement agreements with any of the property owners regarding the mold remediation. BPI received two letters from attorneys for unit owners in response to the Consent and a letter from an

---

[3] There are two Consent forms, one submitted to the rental program owners and one submitted to the non-rental program owners. The Consent forms are substantially the same and are collectively referred to as the Consent.

6

attorney for a Kingsmill homeowners' association. The letters from the attorneys from the unit owners expressed concerns about the form and content of the Consent. The letter from the attorney for the homeowners' association expressed a number of concerns about the extent and cause of the mold infestation and the means of remediation.

BPI began remediation related activity by November 25, 2003. On December 1, 2003, BPI first notified National Union of the Kingsmill mold problem. The remediation process extended into 2004. BPI did not finish gutting units until sometime after mid-March 2004. The remediation was substantially completed in June or July 2004.

National Union issued Umbrella Liability Policy BE 309 14 12 for the policy period of September 1, 1994 to July 1, 2003 (the 1994 policy). The 1994 policy provides up to $25 million of specified coverage in excess of underlying insurance. The 1994 policy is excess to underlying comprehensive general liability insurance with a $2 million limit of liability each occurrence for property damage, a $2 million aggregate limit of liability for certain property damage, and a $22 million aggregate limit of liability for property damage arising out of completed operations. National Union issued Commercial Umbrella policy BE 2860272 for the policy period July 1, 2003 to July 1, 2004 (the 2003 policy). The 2003 policy provides up to $50 million of specified coverage in excess of underlying insurance. The 2003 policy is excess to underlying general liability insurance with a $5 million retained limit.

By letter dated June 18, 2008, National Union addressed coverage under the two National Union policies. The letter noted that National Union did not have evidence that BPI was legally obligated to pay damages or incurred liability imposed by law in

connection with the Kingsmill mold remediation as would be required for the policies to provide coverage. Additionally, the letter requested information to facilitate its coverage investigation. On December 17, 2012, BPI filed this lawsuit.

B.     Discussion

National Union raises five issues in its motion for summary judgment. The Court will address only the first issue as it is dispositive. National Union contends BPI is not entitled to coverage for the costs to repair property damaged by mold because it cannot show, as required by the policies at issue, that it was "legally obligated to pay" for such damages. The 1994 policy provides that National Union must pay only those sums "which the Insured shall become legally obligated to pay as damages for liability imposed upon the Insured by law, or liability assumed by the Insured under contract . . . ." The 2003 policy provides that National Union must pay only those sums "that the Insured becomes legally obligated to pay by reason of liability imposed by law or assumed by the Insured under an Insured Contract because of . . . Property Damage . . . ." National Union argues that BPI is not entitled to coverage for costs to repair property damage based on its bare assertion that it was liable. Relying on *D.R. Sherry Construction, Ltd. v. American Family Mutual Insurance Co.*, 316 S.W.3d 899 (Mo. 2010), National Union maintains that, under Missouri law, a legal obligation to pay for insurance purposes requires at least a settled claim against the insured that gives rise to a legally enforceable obligation.

In response, BPI argues that it need only show it faced potential legal liability to satisfy the "legally obligated prong" in the policies and that no claim, lawsuit, or

8

settlement was necessary to trigger coverage.[4] BPI argues National Union misstates the

decision in *D.R. Sherry Construction, Ltd.* According to BPI, the court in *D.R. Sherry*

*Construction, Ltd.* recognized that a formal claim, judicial determination, or formal

settlement agreement is not necessary where there is evidence the insured was legally

obligated to a third party. Contrary to BPI's argument, the court in *D.R. Sherry*

*Construction, Ltd.* held that the plaintiff was "legally obligated to pay damages" to a third

party because of a claim and a settlement agreement. Specifically, the court held:

> After American Family informed Sherry that it would not undertake further
> investigation [of] the claim until the homeowners filed a lawsuit, Sherry
> repurchased the home pursuant to a settlement agreement. A settlement agreement
> is a contract that creates legally enforceable obligations. Because of the settlement
> agreement, Sherry legally was obligated to pay damages to the homeowners.

*D.R. Sherry Construction, Ltd.*, 316 S.W.3d at 906. Missouri law, therefore, recognizes a

claim and a settlement agreement as sufficient to establish that an insured is "legally

obligated to pay damages."

In other states, the Court notes divergent judicial views on what is required to

establish that an insured is "legally obligated to pay damages." In *Builders Mut. Ins. Co.*

*v. Dragas Mgmt. Corp.,* 793 F.Supp.2d 785, 796–97 (E.D. Va.2011) *vacated on other*

*grounds,* 497 Fed.Appx. 313 (4th Cir.2012), the court held that the term "legally

obligated to pay as damages" under a CGL policy requires a final judgment or a

---

[4] Additionally, BPI contends National Union's corporate representative admitted it need
only show potential legal liability to satisfy the legally obligated language in the policy
and that National Union is bound by that admission. Any such "admission" would be a
legal conclusion and does not constitute a binding admission. *See R & B Appliance
Parts, Inc. v. Amana Co.., L.P.*, 258 F.3d 783, 787 (8th Cir. 2001) (finding that
manufacturer is not bound by legal conclusion testified to in a corporate representative
deposition).

settlement as a result of a lawsuit. The court noted that this position had been taken by a number of courts that have considered this issue. *Id.* (citing *Permasteelisa CS Corp. v. Columbia Cas. Co.,* 377 Fed.Appx. 260, 264–65 (3d Cir. 2010) (unpublished) (citing *Bacon v. Am. Ins. Co.,* 330 A.2d 389, 393 (N.J.Super. Ct. Law Div.1974)); *Detroit Water Team Joint Venture v. Agric. Ins. Co.,* 371 F.3d 336, 339 (6th Cir. 2004) ( "[T]he term 'legal obligation' requires either a judicial determination of liability or a settlement between the insurer, insured, and the claimant."); *Stanford Trading Co. v. Nationwide Mut. Ins. Co.,* 237 F.3d 631, 2000 WL 1701741 (5th Cir. 2000) (per curiam) (unpublished table decision); *Klein v. Fid. & Deposit Co. of Am.,* 700 A.2d 262, 271 (Md.Ct. Spec.App.1997) (holding letters which warned that claims were imminent were not sufficient to show a "legal obligation" to pay)). The court discussed two other cases with similar holdings - *Cincinnati Insurance Co. v. Crossmann Communities Partnership,* No. 05–470–KSF, 2008 WL 852133, at \*5 (E.D. Ky. Mar. 28, 2008) ("[T]he court is reluctant to say that a written demand alone, without the coercive force of a lawsuit, can be considered a process that could result in the insured being 'legally obligated to pay.'") and *Nationwide Mutual Insurance Co. v. Regional Electric Contractors, Inc.,* 680 A.2d 547, 552 (Md.Ct. Spec.App. 1996) (holding that if the insurer was "obligated to indemnify Regional before Regional was found to be 'legally obligated to pay,' [it would] expand[ ] the policy's coverage to an extent contemplated neither by [the insurer] nor by Regional.").

*Builders Mut. Ins. Co.* noted that some courts have held that "legal obligation" does not require a determination of liability by a court or consent by the insurer. For

10

example, in *Potomac Ins. of Illinois v. Huang,* No. 00-4013-JPO, 2002 WL 418008, at

*10 (D. Kansas March 1, 2002), the court held that an insured may recover sums paid as

part of a reasonable settlement made in good faith. In *Potomac*, the court stated "well-

settled Kansas law . . . allows an insured to recover amounts paid to settle a covered

claim if the settlement is reasonable in amount and made in good faith. The insured bears

the initial burden to prove a prima facie case by producing evidence of the good faith and

reasonableness of its settlement." *Id.* (internal quotation marks and citations omitted).

Additionally, "in cases of environmental pollution and its regulation by state and federal

entities, the courts have been more willing to find sums paid to remediate damage done to

specific property or to pay into a state cleanup fund to be the result of 'legal obligation.'"

*Builders Mut. Ins. Co.*, 793 F.Supp.2d at 795 (citing *Colonial Gas Co. v. Aetna Cas. &

Sur. Co.,* 823 F.Supp. 975, 979 (D.Mass.1993) (holding that when an insured voluntarily

paid into an environmental settlement fund, "requiring an insured to go through the

motions of inviting and answering a lawsuit when having no genuine defense would be

contrary to the public policy of guarding the courts against unnecessary litigation."

(internal quotation marks and citation omitted)); *Bausch & Lomb Inc. v. Utica Mut. Ins.

Co.,* 330 Md. 758, 625 A.2d 1021, 1032 (Md.Ct.App.1993) (holding that because Bausch

& Lomb was subject to a strict liability environmental statute, it was "legally obligated"

to pay response costs for compliance with that statute)).

The foregoing cases stand for the proposition that, at a minimum, the courts with

the broadest view of "legally obligated to pay as damages" require the insured to show

potential liability and a reasonable, good faith settlement agreement. The exception

11

appears to be cases involving environmental cleanup where there is a statutory or regulatory mandated cleanup. *See Central Illinois Light Co. v. Home Ins. Co.*, 213 Ill.2d 141,174-75 (2004) (insured operating under legal obligation when it participated in voluntary cleanup when confronted with assertion by EPA that it intended to enforce strict liability statute on insured for contaminated property); *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 625 A.2d 1021, 1032 (Md. Ct. App. 1993) (holding that because plaintiff was subject to a strict liability environmental statute, it was "legally obligated" to pay response costs undertaken in regulatory context); *but see Certain Underwriters at Lloyd's of London v. Superior Court*, 16 P.3d 945, 951 (Cal. 2001) (holding that "insurer's duty to indemnify the insured for 'all sums that the insured becomes legally obligated to pay as damages' is limited to money ordered by a court" and does not include expenses assessed in administrative proceedings under state environmental statute in connection with cleanup and abatement of contamination in soil and groundwater). Requiring a settled claim, except in environmental cleanup cases where the legal obligation is mandated by statute, also serves the purpose of providing the insurer with an opportunity to investigate and weigh in on the claim and protect the insurer's interest as established by the insurance policy.

In this case, BPI did not settle any potential or formal claims or lawsuits. It is undisputed that none of the property owners made any claims or filed any lawsuits against BPI related to the mold issue at Kingsmill. It is also undisputed that BPI did not enter into any settlement agreements with, or obtain any releases of claims from, the property owners with regard to the mold remediation undertaken by BPI at its own cost.

12

In essence, BPI proposes that this Court depart from existing case law and hold that "legally obligated to pay as damages" does not require a settled claim or a settlement or judgment arising from a lawsuit, but instead simply requires BPI to show potential legal liability and voluntary payment of alleged damages without a release or settlement agreement. This position is supported neither by existing Missouri law nor by any other states that have considered this issue. Further, it would be unreasonable for an insured to be able to unilaterally obligate an insurer to pay damages where there has been no protection of the insurer's interest. Without a settled claim or a settlement or judgment arising from a lawsuit, BPI cannot show it was "legally obligated to pay by reason of liability imposed by law." As a result, there is no coverage under the insurance policies.

BPI argues another basis for coverage – that its promise to remediate triggered coverage under the policy language "liability assumed by the Insured by contract." BPI contends that it made a promise to remediate the mold and pay 100% of that cost orally and in writing. BPI claims that the oral promise was made to unit owners during a meeting and confirmed in the Consent form submitted to the owners for the mold remediation.

It is clear, however, that the Consent does not constitute liability assumed by the Insured under contract. The Consent, which was submitted to the owners, expressly stated it did not obligate BPI to remediate the mold, did not constitute an acknowledgment or admission of liability, and did not include a release or settlement of any potential claim the property owner might have against BPI. The Consent forms submitted to the unit owners, National Union's exhibits I and J, are set forth in full

13

following this memorandum and order. Contrary to BPI's claim, the Consent did not contractually obligate BPI and did not assume liability under contract. The Consent is nothing more than the property owner's authorization for BPI to proceed with the abatement project in its sole and absolute discretion. As a result, BPI cannot show that it was legally obligated to pay damages by reason of liability assumed under contract and, therefore, there is no coverage under the insurance policies.

Finally, BPI argues that National Union is not entitled to summary judgment because it pled as an affirmative defense that National Union is equitably estopped from asserting that BPI was not legally obligated. According to BPI, if National Union believed coverage under its policy required receipt of a written claim or a formal settlement agreement, and that BPI would forfeit coverage by proceeding without waiting for formal claims, it was required to say so. BPI argues that because National Union neither said nor did anything to indicate it was not in full agreement with BPI's remediation plan, National Union is now estopped from denying coverage on the basis that BPI was not legally obligated to pay. BPI contends this is a case of estoppel by silence.

"Equitable estoppel arises from the unfairness of allowing a party to belatedly assert known rights on which the other party has, in good faith, relied thereby and become disadvantaged." *Tinch v. State Farm Ins. Co.*, 16 S.W.3d 747, 751 (Mo. App. E.D. 2000). "The elements of estoppel are (1) an admission, statement, or act inconsistent with the claim afterwards asserted and sued upon, (2) action by the other party on the faith of such admission, statement, or act, and (3) injury to such other party,

14

resulting from allowing the first party to contradict or repudiate the admission, statement, or act. *American Eagle Waste Industries, LLC v. St. Louis County*, 379 S.W.3d 813, 827-28 (Mo. banc 2012) (internal quotation marks and citation omitted). "There must be a representation made by the party estopped and relied upon by another party who changes his position to his detriment." *Comens v. SSM St. Charles Clinic Medical Group, Inc.*, 258 S.W.3d 491, 496-97 (Mo.App. E.D. 2008). "The representation may be manifested by affirmative conduct in the form of acts or words, or by silence amounting to concealment of material facts." *Id.* at 497. The doctrine of equitable estoppel is not a favorite of the law and will not be applied lightly." *Farmland Industries, Inc. v. Bittner*, 920 S.W.2d 581, 583 (Mo.App. W.D. 1996). "It can only be used when each element clearly appears, and the burden of proof is upon the party asserting it to establish the essential facts by clear and satisfactory evidence." *Id.* "The doctrine of estoppel may not be employed to create coverage where it otherwise does not exist." *Tinch*, 16 S.W.3d at 751.

BPI has not presented any evidence in support of its claim of equitable estoppel. It has not offered evidence that it relied to its detriment on National Union's alleged failure to tell BPI of the requirement of a legal obligation to pay. Nor has it offered evidence that its decision to remediate the units, which occurred before BPI notified its insurers, was contingent on National Union providing coverage for the costs. Nor has it shown that it relied on National Union's silence in continuing to remediate the units after it notified its insurers. Therefore, BPI has not established a genuine dispute of a material

15

fact in support of its equitable estoppel argument on the coverage issue so as to preclude summary judgment.

**V.   All other pending motions**

There are seven additional pending motions in this matter including plaintiff's motion for partial summary judgment, four motions to exclude expert testimony, motion to bifurcate trial, and defendant's motion for leave to supplement summary judgment record. All remaining pending motions are denied as moot.

**VI.   Conclusion**

In sum, this Court finds that BPI cannot show, as required by the policies at issue, that it was legally obligated to pay damages for any property damaged by the mold in the units at Kingsmill. Therefore, there is no coverage under the insurance policies at issue and National Union is entitled to judgment as a matter of law.

Accordingly,

**IT IS HEREBY ORDERED** that defendant National Union's motion for summary judgment (ECF #55) is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiff BPI's motion for partial summary judgment (ECF #66) and all remaining motions are **DENIED as moot**.

A separate Judgment will accompany this Memorandum and Order.

Dated this 31st day of October, 2014.

STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE

16

Exhibit I

# RENTAL PROGRAM OWNER'S
## Consents and Authorizations
### KINGSMILL RESORT CONDOMINIUMS

The purpose of this document is to allow Busch Properties, Inc. d/b/a Kingsmill Resort ("Kingsmill") to determine as promptly as possible the level of support and agreed upon participation of the condominium owners who lease units in connection with the operation of the Kingsmill rental program (the "Rental Program") for Kingsmill's proposal for the abatement of mold and removal and disposal of mold contaminated material, and subsequent renovation of the condominium units that participate in the Rental Program. Please complete this form and return it via facsimile transmission to **Bill Nason at (757) 564-5322 by 5:00 p.m. on November 10, 2003**. The original should be sent via first class mail to:

> Bill Nason
> The Kingsmill Resort
> 1010 Kingsmill Road
> Williamsburg, Virginia 23185

Unit Number(s):_____

NAMES OF ALL TITLED OWNERS (Please print):

_____

Condominium Association (Please check the appropriate block):

☐ Conference Center Condominium Association

☐ Padgett's Ordinary Condominium Association

☐ Padgett's Ordinary Condominium Association, Phase III

☐ Pelham's Ordinary Condominium Association

The Undersigned(s) hereby:

I.   Represent that the Undersigned is the owner of the above-referenced unit ("Unit").

II.  Authorize Kingsmill to hire contractors in their own name or on my behalf to abate mold and remove and dispose of mold contaminated material from the Unit.

204464.04

III.  Understand that the abatement will be done at no cost to the Undersigned and that if required by Kingsmill, the Undersigned agree to enter into a contract with a contractor selected by Kingsmill for abatement of mold and removal and disposal of mold contaminated material in the Unit based upon the understanding that the cost of such work will be paid by Kingsmill.

IV.  Authorize the removal from the Unit and storage of all fixtures, furnishings and other personal property contained in the Unit (the "Personal Property") including, but not limited to, cabinetry, furniture and carpet (if not disposed of pursuant to Paragraph V) at Kingsmill's expense.

V.  Authorize the disposal of any and all items contaminated by mold including, but not limited to, drywall, fixtures, furnishings, furniture, carpet, and window treatments. The determinations of mold contamination removed, and remediation shall be made by Kingsmill, in Kingsmill's sole and absolute discretion.

VI.  Understand that this consent and authorization does not obligate Kingsmill to proceed with the abatement project, renovation project or Rental Program should Kingsmill determine, in Kingsmill's sole and absolute discretion, not to proceed for any reason including, but not limited to, that it has not received the required consents and authorizations or subsequent documentation from the requisite number of other owners of other units in the four condominium developments which make up the Rental Program.

VII.  Understand and agree that Kingsmill's offer to abate and remove all mold from the Unit does not constitute an acknowledgment or admission of liability by Kingsmill with regard to the existence of mold in the Unit or any mold-related damage.

VIII.  Understand and agree that the sequence and method of the work and access to the Unit during abatement and remediation shall be under the exclusive control of Kingsmill or its authorized representative.

IX.  Understand and agree that I must make arrangements to retrieve and/or dispose of the Personal Property upon notice from Kingsmill. In the event the Undersigned fail or refuse to retrieve and/or dispose of the Personal Property, Kingsmill may continue to store the Personal Property at my expense or dispose of such personal property as Kingsmill deems fit.

X.  Agree to participate in the renovation program based upon the terms outlined in Kingsmill's letter of October 24, 2003 for the renovation of participating condominium units in the Rental Program which I understand will be more fully detailed in subsequent documentation in the coming weeks.

204464.04

XI.     Agree to execute such other documents as may be necessary to allow the abatement, renovation and the Rental Program to proceed as proposed by Kingsmill.

XII.    Direct the condominium association referenced above to participate in Kingsmill's mold abatement plan and likewise authorize Kingsmill to remediate mold infestation and damage to the common elements of my respective condominium.

XIII.   My consent is hereby given and deemed delivered in The Commonwealth of Virginia.

In executing this document I understand that it is intended to be irrevocable and a blanket consent and authorization which allows Kingsmill either directly or on my behalf, at Kingsmill's sole cost and expense, to take whatever actions it deems necessary to abate mold and remove mold contaminated material from the Undersigned's Unit.

Signatures of All Titled Owners:

_____

_____

Date:   November 19, 2003

Accepted:

Busch Properties, Inc.
d/b/a Kingsmill Resort

By:_____

204484.04

## NON-RENTAL PROGRAM OWNER'S
## Consents and Authorizations
## KINGSMILL RESORT CONDOMINIUMS

The purpose of this document is to allow Busch Properties, Inc. d/b/a Kingsmill Resort ("Kingsmill") to determine as promptly as possible the level of support and agreed upon participation of the condominium owners for Kingsmill's proposal for the abatement of mold and removal and disposal of mold contaminated material from the below referenced condominiums including the below referenced unit (the "Unit"). Please complete this form and return it via facsimile transmission to **Bill Nason at (757) 564-5322 by 5:00 p.m. on November 10, 2003.** The original should be sent via first class mail to:

> Bill Nason
> The Kingsmill Resort
> 1010 Kingsmill Road
> Williamsburg, Virginia 23185

Unit Number(s):_____

NAMES OF ALL TITLED OWNERS (Please print):

_____

Condominium Association (Please check the appropriate block):

☒ Conference Center Condominium Association

☐ Padgett's Ordinary Condominium Association

☐ Padgett's Ordinary Condominium Association, Phase III

☐ Pelham's Ordinary Condominium Association

The Undersigned(s) hereby:

I.  Represent that the Undersigned is the owner of the Unit.

II.  Authorize Kingsmill to hire contractors in their own name or on my behalf to abate mold and remove and dispose of mold contaminated material from the Unit.

III. Understand that the abatement will be done at no cost to the Undersigned and that if required by Kingsmill, the Undersigned agree to enter into a contract with a contractor selected by Kingsmill for abatement of mold and removal and disposal of mold contaminated material in the Unit based upon the understanding that the cost of such work will be paid by Kingsmill.

IV. Authorize the removal from the Unit and storage of all fixtures, furnishings and other personal property contained in the Unit (the "Personal Property") including, but not limited to, cabinetry, furniture and carpet (if not disposed of pursuant to Paragraph V) at Kingsmill's expense.

V. Authorize the disposal of any and all items contaminated by mold including, but not limited to, drywall, fixtures, furnishings, furniture, carpet, and window treatments. The determinations of mold contamination removed, and remediation shall be made by Kingsmill, in Kingsmill's sole and absolute discretion.

VI. Understand that this consent and authorization does not obligate Kingsmill to proceed with the abatement project, renovation project or Kingsmill's rental program should Kingsmill determine, in Kingsmill's sole and absolute discretion, not to proceed for any reason including, but not limited to, that it has not received the required consents and authorizations or subsequent documentation from the requisite number of other owners of other units in the four condominium developments which make up the Kingsmill's rental program.

VII. Understand and agree that Kingsmill's offer to abate and remove all mold from the Unit does not constitute an acknowledgment or admission of liability by Kingsmill with regard to the existence of mold in the Unit or any mold-related damage.

VIII. Understand and agree that the sequence and method of the work and access to the Unit during abatement and remediation shall be under the exclusive control of Kingsmill or its authorized representative.

IX. Agree that Kingsmill's obligations and responsibilities shall be as outlined in the Removing the Mold, what is covered and what is not covered sections of Kingsmill's letter of October 31, 2003.

X. Agree to execute such other documents as may be necessary to allow the abatement to proceed as proposed by Kingsmill.

XI. Direct the condominium association referenced above to participate in Kingsmill's mold abatement plan and likewise authorize Kingsmill to remediate mold infestation and damage to the common elements of my respective condominium.

XII.   My consent is hereby given and deemed delivered in The Commonwealth of Virginia.

In executing this document I understand that it is intended to be irrevocable and a blanket consent and authorization which allows Kingsmill either directly or on my behalf, at Kingsmill's sole cost and expense, to take whatever actions it deems necessary to abate mold and remove mold contaminated material from the Undersigned's Unit.

Signatures of All Titled Owners:

Date: 11/03/03

Accepted:

Busch Properties, Inc.
d/b/a Kingsmill Resort
By: